AO 106 (Rev. 04/10) Application for a Search Warrant

**SEALED**

# UNITED STATES DISTRICT COURT

**UNSEALED PER ORDER OF COURT**

for the

Southern District of California

**FILED**

MAY 1 6 2017

CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) | Case No. |
| **Facebook Account #100007287525305** | ) ) ) | |

## APPLICATION FOR A SEARCH WARRANT

**'17 MJ 1519**

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A-3.

located in the ____**Northern**____ District of _____**California**_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B-3.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☐ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1951 | The Hobbs Act |
| 18 U.S.C. § 922(g) | Felon in Possession of Firearm and Ammunition |

The application is based on these facts:

**Please see the attached Affidavit of Alex Esconde.**

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days (give exact ending date if more than 30 days _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

**Alex Esconde, Special Agent FBI**
*Printed name and title*

Sworn to before me and signed in my presence.

Date: **May 16, 2017**

_____
*Judge's signature*

City and state: San Diego, California

**Hon. Andrew G. Schopler, U.S. Magistrate Judge**
*Printed name and title*



## ATTACHMENT A-3

### PROPERTY TO BE SEARCHED

Information associated with the Facebook accounts that is stored at premises controlled by Facebook, a company whose headquarters is located at 1601 Willow Road, Menlo Park, CA:

    a. Facebook username 100007287525305, associated with Facebook user #100007287525305, with Facebook vanity name "King Don Don" (**Target Account 2**).

# ATTACHMENT B-3

## I.  Service of Warrant

The officer executing the warrant shall permit Facebook, Inc., as custodian of the computer files described in Section II below, to locate the files and copy them onto removable electronic storage media and deliver the same to the officer.

## II.  Items to be Provided by Facebook, Inc.

Any and all messages, e-mails, records, files, logs, or information (whether deleted or not) concerning:

A.  All records or other information regarding the identification of the account, to include subscriber information, full name, physical address, telephone numbers and other identifiers, records of session times and durations, the date on which the account was created, the length of service, the IP address used to register the account, log-in IP addresses associated with session times and dates, account status, e-mail addresses provided during registration, methods of connecting, log files, and means and source of payment (including any credit or bank account number);

B.  Any and all phone detail identification information;

C.  Any and all available location data;

D.  All photos and/or videos stored by an individual using this account;

E.  All messages and status updates posted by an individual using this account ;

F.  If available, location settings (such as location-based reminders set up by an individual using the account), Home screen and app organization;

///

///

///

III.   **Items to be Seized as Evidence**

The search of the data supplied by the Facebook, Inc. pursuant to this warrant will be conducted by FBI as provided in the "Procedures For Electronically Stored Information" of the affidavit submitted in support of this search warrant and will be limited to the seizure of:

a.  a.  Communications, records, and attachments tending to discuss or establish robberies or attempted robberies for the period from March 23, 2017 to May 11, 2017;

b.  Photographs or videos depicting clothing, disguises worn (e.g., masks or bandanas), weapons and materials used during the robberies, along with any proceeds attained from the robbery and materials taken from the robbed locations;

c.  Location data tending to indicate that the account user and/or accomplices were located in the vicinity of the targeted businesses at the time of the robberies and attempted robberies, had to travelled to or from the targeted businesses, or had scouted the locations prior to the robberies and attempted robberies for the period from March 23, 2017 to May 11, 2017;

d.  Communications, records, and attachments that provide context to any communications described above, such as electronic mail sent or received in temporal proximity to any relevant electronic mail and any electronic mail tending to identify users of the subject accounts for the period from March 23, 2017 to May 11, 2017 ; and

e.  Photographs or videos depicting firearms or ammunition;

**which are evidence of violations of 18 U.S.C. §§ 1951, 922(g) .**

MCB
5/16/17

# AFFIDAVIT IN SUPPORT OF
# APPLICATION FOR A SEARCH WARRANT

I, Alex Esconde, being duly sworn, declare and state:

## I.

## INTRODUCTION

1.      I am a Special Agent of the Federal Bureau of Investigation (FBI), and have been so since February 2003.  I am assigned to the San Diego Field Division, Violent Crimes Task Force as the Bank Robbery Coordinator.  I am also assigned to investigate violent crimes that include robberies, murder, kidnappings, and assaults on federal officers.  During the course of my duties, I have prepared search and arrest warrants and have participated in the execution of search and arrest warrants.   The information contained in this affidavit is based upon my personal knowledge and on the information I have learned from reviewing official reports and speaking with other local and federal law enforcement officers.

2.      The result of my training and experience, and my conversations with other Special Agents of the FBI, and Task Force Officers (TFOs), as well as Detectives and Officers and other local investigators familiar with violent crime, and bank robberies, form the basis of opinions and conclusions set forth below, which I drew from the facts set forth herein.  Dates and times outlined below are approximate.

3.      I make this affidavit, in part, based on personal knowledge derived from my participation in this investigation and, in part, based upon information from: (a) oral and written reports about this investigation which I have reviewed; (b) physical surveillance conducted by federal agents or local law enforcement agents, which observations have been reported to me either directly or indirectly; and (c) statements of cooperating individuals.

4.      Except as otherwise noted, information set forth in this affidavit has either been observed or provided to me by law enforcement officers with whom I have spoken,

who were involved in this investigation, or whose reports I have read and reviewed. Likewise, information resulting from surveillance, except where otherwise indicated, does not necessarily set forth my own observations but rather has been provided directly or indirectly by other law enforcement officers who conducted such surveillance.

5.     Because this affidavit is being submitted for the limited purpose of seeking the search warrant specified below, I have not set forth each and every fact learned during the course of the investigation. Rather, I have set forth only those facts that I believe are necessary to establish probable cause for the requested warrant.

6.     In my training and experience, I have learned that individuals often use their cell phones and electronic media to conspire, plan and coordinate their criminal activities and that cellphones and electronic media retain information such as communications, photographs, and location data that evidence criminal activities.

7.     I respectfully submit that the facts contained in the numbered paragraphs below demonstrate that there is probable cause to believe that evidence of crimes, in violation of 18 U.S.C. § 1951, Hobbs Act – Interference with Commerce by Threats or Violence, and 18 U.S.C. § 922(g), Felon in Possession of a Firearm or Ammunition (the "Target Offenses"), as described in **Attachments B-1, B-2, and B-3**, will be found  on the following device and Facebook[1] accounts:

> a. ZTE Model Z981
>    IMEI:[2] 863461035198761
>    Serial Number: 890126032393784
>    (hereinafter referred to as "**TT#2**");

---

[1]     Facebook, Inc., 1601 Willow Road, Menlo Park, California 94025 is an Internet company which, among other things, provides electronic communication services to subscribers. Facebook's electronic Messenger service allows subscribers to communicate with other ISP subscribers through the Internet. Subscribers to Facebook use unique screen names and/or email addresses during communications with others.  The screen names and/or email addresses may or may not identify the real name of the person using a particular screen name or email account.

[2]     International Mobile Equipment Identity (IMEI) numbers are unique identification numbers assigned to mobile communication devices.

　　　　b. Facebook username "TriggaTrim4"
　　　　　Facebook #100001394944984
　　　　　Facebook vanity name "Tom Marquis Anderson"
　　　　　(hereinafter referred to as **Target Account 1**); and

　　　　c. Facebook username 100007287525305,
　　　　　Facebook #100007287525305
　　　　　Facebook vanity name "King Don Don"
　　　　　(hereinafter referred to as **Target Account 2**);

as described in Attachments **A-1**, **A-2**, and **A-3**.

　　　8.　　**TT#2** was seized as part of a May 11, 2017 search warrant at 1703 Paseo Aurora, San Diego, California, and is being held as evidence by the FBI at a location in the Southern District of California.

## II.

## FACEBOOK, INC.

　　　9.　　Facebook owns and operates a free-access social networking website of the same name that can be accessed at http://www.facebook.com.  Facebook allows its users to establish accounts with Facebook, and users can then use their accounts to share written news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

　　　10.　　Facebook asks users to provide basic contact and personal identifying information to Facebook, either during the registration process or thereafter.  This information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers (for password retrieval), physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.  Facebook also assigns a user identification number to each account.

　　　11.　　Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network.  A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend

3

Request." If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other. Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

12.    Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts. By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users. A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings. Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

13.    Facebook users can create profiles that include photographs, lists of personal interests, and other information. Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list. In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times. A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

14.    Facebook has a Photos application, where users can upload an unlimited number of albums and photos. Another feature of the Photos application is the ability to "tag" (i.e., label) other Facebook users in a photo or video. When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video. For Facebook's purposes, a user's "Photoprint" includes all photos uploaded by

4

that user that have not been deleted, as well as all photos uploaded by any user that have that user tagged in them.

15.   Facebook users can exchange private messages on Facebook with other users. These messages, which are similar to e-mail messages, are sent to the recipient's "Inbox" on Facebook, which also stores copies of messages sent by the recipient, as well as other information. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile. In addition, Facebook has a Chat feature that allows users to send and receive instant messages through Facebook. These chat communications are stored in the chat history for the account. Facebook also has a Video Calling feature, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

16.   If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

17.   Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages. Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (i.e., non-Facebook) websites. Facebook users can also become "fans" of particular Facebook pages.

18.   Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

19.   Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend. The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

20.   Facebook Notes is a blogging feature available to Facebook users, and it enables users to write and post notes or personal web logs ("blogs"), or to import their

5

blogs from other services, such as Xanga, LiveJournal, and Blogger.

21.    The Facebook Gifts feature allows users to send virtual "gifts" to their friends that appear as icons on the recipient's profile page. Gifts cost money to purchase, and a personalized message can be attached to each gift. Facebook users can also send each other "pokes," which are free and simply result in a notification to the recipient that he or she has been "poked" by the sender.

22.    Facebook also has a Marketplace feature, which allows users to post free classified ads. Users can post items for sale, housing, jobs, and other items on the Marketplace.

23.    In addition to the applications described above, Facebook also provides its users with access to thousands of other applications on the Facebook platform. When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

24.    Facebook uses the term "Neoprint" to describe an expanded view of a given user profile. The "Neoprint" for a given user can include the following information from the user's profile:  profile contact information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications.

25.    Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP address. These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action. For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

26.    Social networking providers like Facebook typically retain additional

information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Facebook users may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

27.     Facebook tracks location data for mobile users. The Facebook app has access to a user's location data even when the user is not using the Facebook app.

28.     Therefore, the computers of Facebook are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

## III.

## PROBABLE CAUSE

29.     Since April 6, 2017, the FBI has been investigating Hobbs Act robberies by two unknown targets, hereafter referred to as "Suspect 1" and "Suspect 2."

30.     Between April 6, 2017, and April 22, 2017, robberies were committed or attempted at five markets and one restaurant. A firearm was brandished or discharged during each. At this time, this Complaint alleges violations of federal law by JUAN MARQUIS HOLIDAY with respect to two of those incidents, a robbery on April 6, 2017 (Market at the Ranch) and an attempted robbery on April 20, 2017 (Apollo Market). The robberies and attempted robberies occurred at the following dates, locations, and times:

///

///

| Robbery No. | Date | Time | Victim | Address |
|---|---|---|---|---|
| 1 | 4/6/2017 | 2125 | Market at the Ranch | 10299 Scripps Trail, San Diego, CA |
| 2 | 4/19/2017 | 255 | 7 Eleven | 9365 Jamacha Blvd., Spring Valley, CA |
| 3 | 4/20/2017 | 2036 | Eastridge Liquor | 7705 University Ave. La Mesa, CA |
| 4 | 4/20/2017 | 2105 | Apollo Market | 2327 Reo Drive, San Diego, CA |
| 5 | 4/20/2017 | 2136 | G&M Market | 8903 Jamacha Rd., Spring Valley, CA |
| 6 | 4/22/2017 | 2125 | Victoria's Mexican Grill | 1912 Coronado Ave., San Diego, CA |

31.    At the time of the robberies and attempted robberies, Victoria's Mexican Grill sold Coke that was manufactured in Mexico, and the other five locations sold Sam Adams beer, Marlboro cigarettes, and/or Patron Silver tequila, all of which are manufactured outside of California.

## Market at the Ranch Robbery

32.    On April 6, 2017, at approximately 9:25 PM, Suspect 1 entered the Market at the Ranch convenience store, located at 10299 Scripps Trail, San Diego, CA.  Suspect 1 brandished a semi-automatic handgun, chambered a round, and demanded money from the employee.  During the commission of the crime, Suspect 1 discharged his firearm while inside the store and pistol whipped the employee on the side of his head.  The employee started putting money on the counter.  Suspect 1 hit the employee with the gun two times on the head and told the employee to put the money in a bag. The employee provided Suspect 1 with cash from the drawer. Suspect 1 told the employee to open the safe under the counter. The employee was unable to open the safe and Suspect 1 discharged his firearm into the wall. Suspect 1 went around the counter and started kicking the employee in the legs. Suspect 1 discharged his firearm a second time into the wall.  Suspect 1 took the

money and fled the scene. One Speer Luger 9mm cartridge casing, one R-P 9mm Luger cartridge casing, and two projectiles were recovered at the scene. Suspect 1 was described as a light-skinned black male, approximately 35 to 40 years old, standing approximately 5'7" to 6'0" and weighing about 180-200 pounds. Suspect 1 was wearing a black hooded sweatshirt with the hooded portion cinched to limit the visibility of his face, dark pants, dark shoes, and gray gloves with black palms. Suspect 1's firearm was described as a two-toned (silver/black) 9mm handgun with a silver slide and black frame.

33.    Surveillance footage from across the street from the store shows several sedans and a small SUV drive past Market at the Ranch on Scripps Trail prior to the robbery. As noted above, Market at the Ranch was robbed at approximately 9:25 PM. A resident in the neighborhood told investigators that at "approximately 9:40 PM," he heard what he believed was fireworks and went outside to smoke a cigarette. As he did, the resident noticed a vehicle sixty yards away from his house on Scripps Trail and approximately a block north of Market at the Ranch. The vehicle was parked but running and the interior light was on, and although the vehicle was already running the male in the driver's seat attempted to start it, grinding the gears. The resident said the vehicle then suddenly peeled out and drove north away from Market at the Ranch. The resident described the vehicle as a small SUV, similar to a Ford Escape, and described the driver as possibly white with a buzz cut.

## 7-Eleven Robbery

34.    On April 19, 2017, at approximately 2:55 AM, Suspect 1 entered the 7-11 Store, located at 9365 Jamacha Boulevard, Spring Valley, CA. Suspect 1 brandished a black gun, chambered a round, and told the employee, "Give me all the money from the register!" Suspect 1 then struck the employee in the face with the gun. The employee walked toward the cash register followed by Suspect 1, who told the employee to get a bag and put all the money in the bag. The employee filled the bag with the money from the register. Suspect 1 then struck the cash register drawer with the gun in his hand and also demanded the rolled coins. Suspect 1 asked the employee if there was money in the back

storage room and the employee said there wasn't. Suspect 1 directed the employee to the back storage area and while back there, Suspect 1 struck the employee in the back of the head with the gun. Suspect 1 verified there was no money in the back room and directed the employee back towards the register. Suspect 1 told the employee, "I'm gonna kill you now" and discharged one round into the ceiling just above the registers. Suspect 1 ordered the employee to put all of the Newport brand cigarettes into a plastic bag, which the employee did. Suspect 1 then ordered the employee to put all of the Marlboro brand cigarettes into another bag. The employee complied then the Suspect 1 took the money and cigarettes and fled the scene. One Perfecta 9mm cartridge casing and one projectile were recovered at the scene. Suspect 1 was described as light-skinned, black male, approximately 20 to 25 years old, standing approximately 5'6"-5'8", weighing approximately 180 pounds. Suspect 1 was wearing a red hooded sweatshirt, with black sleeves, with a manufacturing tag showing on the upper back area, with the hooded portion cinched very tightly to limit the visibility of his face, black pants, and black shoes. Suspect 1's firearm was described as a black 9mm handgun.

### Eastridge Liquor Store Attempted Robbery

35.     On April 20, 2017, at approximately 8:36 PM, Suspect 1 entered the Eastridge Liquor Store, located at 7705 University Avenue, La Mesa, CA. Suspect 1 entered the store and chambered a round, but did not see anyone in the store. The employee entered, but ran back out when Suspect 1 pointed the gun at the employee. Suspect 1 fled the scene without any money or merchandise. Suspect 1 was described as a dark skinned male wearing blue hooded sweater, with black sleeves, with a white design on the upper back side of the sweater, which appeared to be the manufacture's tag. The hood of the sweater was cinched down around his face and there was a red mask or bandana covering his face. Suspect 1 was also wearing black pants, dark gray shoes and his blue and white checkered boxers shorts were showing in the waistband area of his pants. Suspect 1's firearm was described as a black semi-automatic handgun with a silver ejection port.

///

## Apollo Liquor Store Attempted Robbery

36.     On April 20, 2017, at approximately 9:05 PM, Suspect 1 entered the Apollo Liquor Store, located at 2327 Reo Drive, San Diego, CA.  There were two employees working at the time. Suspect 1 removed a black handgun from his right pocket and chambered a round. Suspect 1 pointed the gun at the employees and ordered the employees to open the register.  One of the employees ran to the back and hid.  Suspect 2 then entered the store and milled about, while simulating a handgun underneath his jacket.  Suspect 1 went to the back to look for the employee who fled.  Suspect 2 kept telling Suspect 1 to "Hurry up, hurry up."  Suspect 1 went behind the counter, banged on the cash register and demanded money. Suspect 2 exited the store, but came right back in.  Suspect 1 appeared to be leaving, but turned around and pointed the gun at the employee again and demanded money. Suspect 2 approached Suspect 1 and demanded that they leave.  Both fled without any money.  Suspect 1 was described as a light-skinned black male wearing a blue hooded sweater, with black sleeves, with a white design on the upper backside of the sweater, which appeared to be the manufacture's tag, and the hood was cinched down around his face.  He was also wearing red mask or bandana to cover his face, black pants, blue shoes, and his blue and white checkered boxers shorts were showing in the waistband area of his pants. The weapon was described as a black semi-automatic handgun with a silver ejection port. Suspect 2 was described as a thin male wearing a black hooded sweatshirt with the hood cinched down around his face.  He was also wearing a white shirt, blue jeans with rips on the left knee area, and black and white "Jordan" style shoes.

## G&M Market Attempted Robbery

37.     On April 20, 2017, at approximately 9:36 PM, Suspect 1 entered the G&M Market, located at 8903 Jamacha Road, Spring Valley, CA.  Suspect 1 brandished a black gun, pulled the slide back on the gun and demanded money while pointing the gun at the employee.  The employee ran from behind the counter into a small storage closet and closed the door. Suspect 1 exited the store without taking any money or merchandise.  Suspect 1 was described as dark-skinned male, possibly Hispanic, approximately 30 years old,

standing approximately 6'1" in height, and weighing approximately 170 pounds. Suspect 1 was wearing a wearing a blue hooded sweater, with black sleeves, with a white design on the upper back side of the sweater, which appeared to be the manufacture's tag, and the hood was cinched down around his face, a red mask covering his face, black pants, and dark shoes. Suspect 1's firearm was described as a black semi-automatic handgun with a silver ejection port.

### Victoria's Mexican Grill Robbery

38.     On April 22, 2017, at approximately 9:25 PM, Suspect 1 and Suspect 2 entered the Victoria's Mexican Grill restaurant, located at 1912 Coronado Avenue, San Diego, CA. Suspect 1 chambered a round as he entered and demanded money. Suspect 1 ordered everyone to get down while the employee opened the cash register. Suspect 2 reached into the cook's pants and took approximately $325.00 from the cook. Suspect 2 simulated a handgun underneath his jacket. Both left with the cash register drawer and the money from the cook. Suspect 1 was described as a black male, approximately 20 years old, standing approximately 5'9"-6'0", with a thin build. Suspect 1 was wearing a blue hooded jacket, with black sleeves, with the hood drawn tight around his face and "SD" in white lettering on the front of the jacket. Suspect 1 was also wearing black pants and dark shoes. Suspect 2 was described as a black male, approximately 20 years old, standing approximately 5'9"-6'1" with a thin build. Suspect 2 was wearing a dark blue hooded jacket with the hood cinched down around his face. Suspect 2 was also wearing a white shirt under the jacket and black and white "Jordan" style shoes. Suspect 1's firearm was described as a black semi-automatic handgun.

### Identification of Suspects

39.     On April 10, 2017, San Diego Police Department Patrol Officers, in a marked unit, attempted to stop a red Toyota Camry (the Camry), traveling northbound on Altadena Avenue, in San Diego, California, for running a stop sign. The Camry did not yield to the officers and, after a pursuit, crashed into an embankment. All four occupants fled on foot. Three of the four occupants of the vehicle, including HOLIDAY, Pedro Naranjo (Naranjo),

and a juvenile, were taken into custody after a short foot pursuit while the fourth occupant was not caught. The officers involved in this pursuit were shown a photograph of Don Jones III (JONES). One officer said JONES. looked like the individual who ran from the Camry on April 10th and eluded the officers. The other officer said JONES. "definitely" looked like the individual. The three individuals who were apprehended, including HOLIDAY, were booked and released.

40.     At the time of his arrest on April 10, 2017, HOLIDAY was wearing a blue-hooded sweatshirt, with black sleeves, and "SD" in white lettering in front of the sweatshirt. HOLIDAY is a known Neighborhood Crips gang member and has used the monikers "Tiny Trim" and "Trigga Trim." On May 8, 2017, a FBI Special Agent reviewed publicly available Facebook pages for Facebook username "TriggaTrim4," **Target Account 1**. **Target Account 1** contained multiple photos, dated April 8, 2017, with HOLIDAY, JONES., and other unknown males. In these photos, HOLIDAY was wearing the same blue hooded sweatshirt, with black sleeves, and "SD" in white lettering in front of the sweatshirt as when he was arrested and released on April 10, 2017. The sweatshirt matches the description of the sweatshirt worn by Suspect 1 in the April 22, 2017 robbery. The color and pattern of the sweatshirt matches the sweatshirt worn by Suspect 1 in the three April 20, 2017 robberies.

41.     The Camry was impounded after the incident. A search of the Camry revealed a SCCY CPX-2 9mm handgun, with a silver slide and black frame located on the floorboard of the rear passenger side, where HOLIDAY had been seated during the pursuit. The weapon had a 9mm round in the chamber and no magazine inserted. A magazine was located near the gun with three R-P 9mm Luger rounds loaded. The seized SCCY CPX-2 9mm handgun matches the description (silver slide and black frame) of the handgun used by Suspect 1 in the April 6, 2017 (Market at the Ranch) robbery. The R-P 9mm Luger ammunition is the same brand of ammunition as a casing recovered from the scene of the Market at the Ranch robbery above. A Deoxyribonucleic Acid (DNA) profile identified from the casings collected at the robbery came back to JONES. Ballistic testing of the

1   SCCY CPX-2 handgun showed that weapon created casing marks that matched the marks
2   on the casings collected at the robbery that occurred at the Market at the Ranch.

3       42.    On May 11, 2017, a search warrant was executed at HOLIDAY's residence.
4   On that same date, police spoke with HOLIDAY's sister, who said she lived at the
5   residence.  During that interaction, police showed Holiday's sister two photographs of
6   Suspect 1 from the April 6, 2017 robbery (Market at the Ranch).  After viewing these two
7   photos Holiday's sister said, "Wow, that resembles my brother but I can't say for certain
8   it's him."   The investigator showed her the photos from the other robbery scenes.
9   HOLIDAY's sister then said she could not identify the suspects and had not seen the
10  clothing in her house.  As provided below, clothing matching that worn by Suspect 1 during
11  the April 20, 2017 robberies was found at the residence.  Police also showed photographs
12  of Suspect 1 from the April 6, 2017 robbery to HOLIDAY's neighbor, who said the suspect
13  appeared to be HOLIDAY.  The investigator then showed him photographs from the April
14  20, 2017 Apollo Liquor store robbery.  The neighbor identified Suspect 2 from the April
15  20, 2017, robbery as the skinny individual that has been staying at HOLIDAY's residence
16  and who has a tattoo over his eyebrow.  JONES is both skinny and has a tattoo over his
17  eyebrow.

18      43.    On May 11, 2017, investigators spoke with JONES's mother-in-law, who said
19  JONES had quit the gang life, moved out-of-state with his wife, and then returned to San
20  Diego for the month of April.  When he returned, she had driven him to a rental car dealer,
21  where he rented a Nissan Rogue, a small SUV that is similar to a Ford Escape.  As provided
22  above, at the time of the April 6, 2017 robbery, a resident nearby noticed a small SUV,
23  which he said was similar to a Ford Escape, parked near the store with driver in the vehicle
24  and the vehicle running.  After the shot, the vehicle accelerated away.  On the night of the
25  April 6, 2017 robbery, approximately an hour and a half after the robbery, a community
26  camera outside of Holiday's residence recorded Holiday, JONES, and a female arrive
27  outside Holiday's residence in a small SUV.

28

44.     During the search of HOLIDAY's residence, officers found black and white checkered boxers that match the boxers worn by Suspect 1 during two of the April 20, 2017 robberies (Eastridge Liquor and Apollo Market). After April 10, 2017, when SDPD seized the SCCY CPX-2 9mm handgun from where HOLIDAY was sitting in the Camry, Suspect 1 began using different firearms in his subsequent robberies, including a black semi-automatic handgun with a silver ejector port. During the search of HOLIDAY's residence, behind a speaker cover, officers found a Model 75 9mm handgun that was black with a silver ejector port. The seized handgun matches the description of the handgun used in the robberies on April 20, 2017 (Eastridge Liquor, Apollo Market, and G&M Market). The seized handgun was loaded with Perfecta 9mm ammunition, which is the same brand of ammunition as the casing recovered from the scene of the April 19, 2017 robbery (7-Eleven).

45.     During the search of HOLIDAY's residence, pursuant to the terms of the search warrant, officers seized **TT#2**. HOLIDAY's family members who lived at the residence indicated that **TT#2** belonged to HOLIDAY.

46.     On May 8, 2017, agents reviewed publicly available Facebook pages for Facebook vanity name "King Don Don," **Target Account 2**. Gang investigators have informed me JONES has used the moniker "King Don Don." **Target Account 2** contained multiple photographs of JONES but it appears that privacy settings have restricted most of the content from being publically viewable.

47.     Law enforcement records indicate, on April 17, 2013, in California Superior Court, JONES suffered a felony conviction for Burglary, in violation of California Penal Code § 459, a crime punishable by imprisonment for a term exceeding one year.

48.     I have learned that SCCY Industries LLC manufactures SCCY CPX-2 9mm handguns and that the firearm was likely manufactured in Florida. I also learned that Remington Arms Company (Remington) manufactures R-P 9mm Luger ammunition, with R-P being the initials for Remington Peters, and that the ammunition was likely not manufactured in California.

## Evidence on Target Device and Accounts

49.     Based upon my experience and training, consultation with other law enforcement officers experienced in robbery investigations, and all the facts and opinions set forth in this affidavit, I know that individuals involved in robberies often retain cell phones that contain:

a.      Photographs of clothing, disguises worn, weapons and materials used during the robbery, along with any proceeds attained from the robbery and materials taken from the robbed location;

b.      Individuals involved in robberies often maintain records of their plans to rob, and records of any reporting of the robberies by the press to the public;

c.      Location data that their phones automatically track and record;

d.      Historical webpage data related to their robbery targets, travel to and from their robbery targets, searches related to methods or techniques for robbery, and searches related to possible security measures at their robbery targets;

e.      Communications with their coconspirators made about or in executing the robbery; and

f.      Celebratory remarks in messages and on social media after the successful completion of a robbery (*e.g.*, "Drinks on me tonight.")

50.     Based upon my experience and training, consultation with other law enforcement officers experienced in robbery and felon in possession investigations, and all the facts and opinions set forth in this affidavit, I know that individuals involved in those crimes may retain on their social media accounts:

a.      Photographs or videos depicting clothing, disguises worn (*e.g.*, masks or bandanas), weapons and materials used during the robbery, along with any proceeds attained from the robbery and materials taken from the robbed location;

b.      Videos discussing or boasting about their crime or financial windfall from successfully completing their crimes;

c.      Communications with their coconspirators made about or in executing the robbery;

d.      Celebratory remarks after the successful completion of a robbery;

e.      Location data indicating that they and accomplices were located in the vicinity of the targeted businesses at the time of the robberies and attempted robberies, had to travelled to or from the targeted businesses, or had scouted the locations prior to the robberies and attempted robberies; and

f.      Photographs or videos depicting firearms or ammunition.

## IV.

## CELL PHONE SEARCH METHODOLOGY

51.     It is not possible to determine, merely by knowing the cellular telephone's make, model and serial number, the nature and types of services to which the device is subscribed and the nature of the data stored on the device. Cellular devices today can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing. An increasing number of cellular service providers now allow for their subscribers to access their device over the internet and remotely destroy all of the data contained on the device. For that reason, the device may only be powered in a secure environment or, if possible, started in "flight mode" which disables access to the network. Unlike typical computers, many cellular telephones do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device. Current technology provides some solutions for acquiring some of the data stored in some cellular telephone models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to

such acquisition, the examiner must examine the device manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer.

52.     Following the issuance of this warrant, FBI will collect the subject cellular telephone and subject it to analysis.  All forensic analysis of the data contained within the telephone and its memory cards, call detail records, and deleted files will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

53.     Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within ninety (90) days, absent further application to this court.

**V.**

**PROCEDURES FOR ELECTRONICALLY STORED INFORMATION**

54.     Federal agents and investigative support personnel are trained and experienced in identifying communications relevant to the crimes under investigation. The personnel of Facebook, Inc. (hereinafter "the internet service provider" or "the ISP") are not.  It would be inappropriate and impractical for federal agents to search the vast computer network of the ISP for the relevant accounts and then to analyze the contents of those accounts on the premises of the ISP.  The impact on the ISP's business would be disruptive and severe.

55.     Therefore, I request authority to seize all content, including electronic mail and attachments, stored instant messages, stored videos, photographs, and any other content from the Facebook accounts, as described in **Attachments B-2, and B-3**. In order to accomplish the objective of the search warrant with a minimum of interference with the business activities of the ISP, to protect the privacy of the ISP's subscribers whose accounts are not authorized to be searched, and to effectively pursue this investigation, the Federal

1  Bureau of Investigation seeks authorization to allow the ISP to make digital copies of the
2  entire contents of the accounts subject to seizure.  The copies will be provided to me or to
3  any authorized federal agent.  The copies will be imaged and the images will then be
4  analyzed to identify communications and other electronic records subject to seizure
5  pursuant to **Attachments B-2, and B-3**.  Relevant electronic records will be copied to
6  separate media.  The original media will be sealed and maintained to establish authenticity,
7  if necessary.

8    56.   Analyzing the data to be provided by the ISP may require special technical
9  skills, equipment, and software.  It may also be very time-consuming.  Searching by
10  keywords, for example, often yields many thousands of "hits," each of which must be
11  reviewed in its context by the examiner to determine whether the data is within the scope
12  of the warrant.  Merely finding a relevant "hit" does not end the review process.  Keyword
13  searches do not capture misspelled words, reveal the use of coded language, or account for
14  slang.  Keyword searches are further limited when electronic records are in or use foreign
15  languages.  Certain file formats also do not lend themselves to keyword searches.
16  Keywords search text.   Many common electronic mail, database and spreadsheet
17  applications, which files may have been attached to electronic mail, do not store data as
18  searchable text.  Instead, such data is saved in a proprietary non-text format.  And, as the
19  volume of storage allotted by service providers increases, the time it takes to properly
20  analyze recovered data increases dramatically.  The ISP do not always organize the
21  electronic files they provide chronologically, which makes review even more time
22  consuming and may also require the examiner to review each page or record for responsive
23  material.

24    57.   Based on the foregoing, searching the recovered data for the information
25  subject to seizure pursuant to this warrant may require a range of data analysis techniques
26  and may take weeks or even months. Keywords need to be modified continuously based
27  upon the results obtained and, depending on the organization, format, and language of the
28  records provided by the ISP, examiners may need to review each record to determine if it

is responsive to **Attachments B-2, and B-3**. The personnel conducting the examination will complete the analysis within ninety (90) days of receipt of the data from the service provider, absent further application to this court.

58.    Based upon my experience and training, and the experience and training of other agents with whom I have communicated, it is necessary to review and seize all electronic mails that identify any users of the subject accounts and any electronic mails sent or received in temporal proximity to incriminating electronic mails that provide context to the incriminating mails.

59.    All forensic analysis of the imaged data will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

## VI.

## GENUINE RISK OF DESTRUCTION OF DATA

60.    Based upon my experience and training, and the experience and training of other agents with whom I have communicated, electronically stored data can be permanently deleted or modified by users possessing basic computer skills.  In this case, the data in **Target Account 1** and **Target Account 2** is being preserved by Facebook for approximately ninety days in anticipation of this application for search warrants.

## VII.

## PRIOR ATTEMPTS TO OBTAIN DATA

61.    The United States has not attempted to obtain this data by other means other than the limited viewing of publically accessible content as described above

## VIII.

## CONCLUSION

62.    Based on the foregoing, I believe there is probable cause to believe items that constitute evidence of violations of federal criminal law, namely, 18 U.S.C. § 1951, Hobbs Act – Interference with Commerce by Threats or Violence, as described in